**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| COREY HARDIN, DAVID MUHAMMAD, and CHASE WILLIAMS, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> TRON FOUNDATION, JUSTIN SUN, and ZHIQIANG (LUCIEN) CHEN, <br><br> Defendants. | Case No.  1:20-cv-02804-VSB <br><br> Honorable Vernon S. Broderick <br><br> **ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS TRON FOUNDATION'S AND JUSTIN SUN'S MOTION TO DISMISS THE <u>AMENDED CLASS ACTION COMPLAINT</u>**

FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA  94104

*Attorneys for Defendants*
TRON FOUNDATION and JUSTIN SUN

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

FACTUAL BACKGROUND ....................................................................................................6

    A.    Defendants .................................................................................................6

    B.    Initial Token Offering ................................................................................7

    C.    Secondary Market Purchases ....................................................................8

    D.    SEC Staff "Framework" ..........................................................................10

    E.    Claims Asserted ......................................................................................11

PROCEDURAL HISTORY ....................................................................................................11

LEGAL STANDARD ............................................................................................................11

ARGUMENT .........................................................................................................................12

I.      PLAINTIFFS' SECTION 12 CLAIMS ARE TIME-BARRED....................................12

    A.    The Section 12(a)(1) Claim Is Untimely .................................................12

    B.    Section 12(a)(2)'s "Discovery Rule" Does Not Make that Claim
        Timely .....................................................................................................14

    C.    Plaintiffs Fail to Allege Fraudulent Concealment as a Basis for Tolling
        the Statute of Limitations for the Section 12(a)(2) Claim ......................16

II.    PLAINTIFFS OTHERWISE FAIL TO STATE A VIABLE CLAIM .............................18

    A.    Plaintiffs, as Secondary Market Purchasers, Fail to State a Claim
        Under Section 12 ....................................................................................18

    B.    TRON Is Not a "Statutory Seller" Under Section 12 ..............................20

    C.    Plaintiffs Fail to Plead an Actionable Misrepresentation or Omission
        under Section 12(a)(2) .............................................................................23

    D.    The United States Securities Laws Do Not Apply to Plaintiffs'
        Transactions ...........................................................................................28

    E.    The State Law Unregistered Offering Claims Fail Absent Standing or
        Privity.....................................................................................................30

    F.    The Nevada Unregistered Offering Claim Is Time-Barred .....................31

# **TABLE OF CONTENTS**

## **(CONTINUED)**

**Page**

G.    Plaintiffs Fail to Plead Control Person Liability Against Mr. Sun ......................32

III.    THE COURT LACKS PERSONAL JURISDICTION OVER MR. SUN AND TRON AND THE FORUM IS INCONVENIENT ............................................................32

A.    There Is No Basis for Personal Jurisdiction over Mr. Sun ....................................33

B.    Even a "Nationwide Contacts" Analysis Would Not Justify the Exercise of Specific Personal Jurisdiction over Mr. Sun or TRON ......................35

C.    Alternatively, this Court Should Dismiss on Grounds of *Forum Non Conveniens* ............................................................................................................37

CONCLUSION....................................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Absolute Activist Master Value Fund, Ltd. v. Ficeto*,
  2013 WL 1286170 (S.D.N.Y. Mar. 28, 2013) ........................................................36

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012)..............................................................................28, 29

*Acito v. IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995)........................................................................................24

*Alibaba Grp. Holding Ltd. v. Alibabacoin Found.*,
  2018 WL 2022626 (S.D.N.Y. Apr. 30, 2018) ........................................................35

*Allen v. Credit Suisse Sec. (USA) LLC*,
  895 F.3d 214 (2d Cir. 2018)....................................................................................12

*Anwar v. Fairfield Greenwich Ltd.*,
  742 F. Supp. 2d 367 (S.D.N.Y. 2010).....................................................................39

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).........................................................................................11, 25

*Baroi v. Platinum Condo. Dev., LLC*,
  914 F. Supp. 2d 1179 (D. Nev. 2012)................................................................30, 31

*Base Metal Trading Ltd. v. Russian Aluminum*,
  98 F. App'x 47 (2d Cir. 2004) ................................................................................39

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 554 (2007)................................................................................................11

*Beres v. Thomson McKinnon Sec., Inc.*,
  1987 WL 16977 (S.D.N.Y. Sept. 10, 1987)............................................................12

*Blockchain Luxembourg S.A. v. Paymium, SAS*,
  2019 WL 4199902 (S.D.N.Y. Aug. 7, 2019)...........................................................37

*Blue Chip Stamps v. Manor Drug Stores*,
  421 U.S. 723 (1975)................................................................................................18

*Brown v. Lockheed Martin Corp.*,
  814 F.3d 619 (2d Cir. 2016)....................................................................................33

*Butala v. Agashiwala,*
    916 F. Supp. 314 (S.D.N.Y. 1996) ........................................................................17

*Capitol Records, LLC v. VideoEgg, Inc.,*
    611 F. Supp. 2d 349 (S.D.N.Y. 2009)....................................................................34

*Capri v. Murphy,*
    856 F.2d 473 (2d Cir. 1988)....................................................................................23

*Carton v. B & B Equities Grp., LLC,*
    2014 WL 4540333 (D. Nev. Sept. 9, 2014) ...........................................................30

*Chambers v. Time Warner, Inc.,*
    282 F.3d 147 (2d Cir. 2002).......................................................................................6

*Chew v. Dietrich,*
    143 F.3d 24 (2d Cir. 1998).......................................................................................36

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,*
    752 F.3d 173 (2d Cir. 2014)...............................................................................26, 27

*Cook v. Avien, Inc.,*
    573 F.2d 685 (1st Cir. 1978)....................................................................................12

*Cornwell v. Credit Suisse Grp.,*
    729 F. Supp. 2d 620 (S.D.N.Y. 2010).....................................................................29

*Cortec. Indus. Inc. v. Sum Holding L.P.,*
    949 F.2d 42 (2d Cir. 1991).......................................................................................21

*Credit Suisse First Boston Corp. v. ARM Fin. Grp., Inc.,*
    2001 WL 300733 (S.D.N.Y. Mar. 28, 2001) .........................................................20

*Daimler AG v. Bauman,*
    571 U.S. 117 (2014).................................................................................................33

*Edgar v. Mite Corp.,*
    457 U.S. 624 (1982).................................................................................................30

*Ehrenfeld v. Bin Mahfouz,*
    9 N.Y.3d 501 (2007).................................................................................................35

*Ellison v. Am. Image Motor Co.,*
    36 F. Supp. 2d 628 (S.D.N.Y. 1999).......................................................................21

*FDIC v. Milken,*
    781 F. Supp. 226 (S.D.N.Y. 1991) ..........................................................................34

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  873 F.3d 85 (2d Cir. 2017)......................................................................................30

*Frontera v. United States*,
  2009 WL 909700 (W.D.N.Y. Mar. 31, 2009).........................................................14

*Goodyear Dunlop Tires Ops., S.A. v. Brown*,
  564 U.S. 915 (2011)................................................................................................33

*Gucci Am., Inc. v. Li*,
  768 F.3d 122 (2d Cir. 2014)....................................................................................35

*Gulf Oil Corp. v. Gilbert*,
  330 U.S. 501 (1947)..........................................................................................39, 40

*Gustafson v. Alloyd Co.*,
  513 U.S. 561 (1995).........................................................................3, 13, 18, 19

*Halperin v. eBanker USA.com, Inc.*,
  295 F.3d 352 (2d Cir. 2002)....................................................................................26

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
  466 U.S. 408 (1984)................................................................................................33

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*,
  936 F.2d 759 (2d Cir. 1991)....................................................................................23

*ICO Servs., Ltd. v. Coinme, Inc.*,
  2018 WL 6605854 (S.D.N.Y. Dec. 17, 2018) ........................................................32

*In re Alcatel Sec. Litig.*,
  382 F. Supp. 2d 513 (S.D.N.Y. 2005)......................................................................16

*In re Alliance Pharm. Corp. Sec. Litig.*,
  279 F. Supp. 2d 171 (S.D.N.Y. 2003)......................................................................24

*In re Amaranth Nat. Gas. Commodities Litig.*,
  587 F. Supp. 2d 513 (S.D.N.Y. 2008), *aff'd*, 730 F.3d 170 (2d Cir. 2013) ......35, 37

*In re Biozoom, Inc. Sec. Litig.*,
  93 F. Supp. 3d 801 (N.D. Ohio 2015)......................................................................13

*In re Britannia Bulk Holdings Inc. Sec. Litig.*,
  665 F. Supp. 2d 404 (S.D.N.Y. 2009)......................................................................27

*In re Cosi, Inc. Sec. Litig.*,
  379 F. Supp. 2d 580 (S.D.N.Y. 2005)........................................................13, 19, 24

*In re Deutsche Telekom AG Secs. Litig.*,
  2002 WL 244597 (S.D.N.Y. Feb. 20, 2002) ................................................................21, 22

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
  761 F. Supp. 2d 504 (S.D. Tex. 2011) ...............................................................................31

*In re Eros Int'l Sec. Litig.*,
  2017 WL 6405846 (S.D.N.Y. Sept. 22, 2017), *aff'd sub nom. Eisner v. Eros
  Int'l PLC*, 735 F. App'x 15 (2d Cir. 2018) ...................................................................26, 27

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  308 F. Supp. 2d 249 (S.D.N.Y. 2004) ................................................................................25

*In re Merrill Lynch Auction Rate Sec. Litig.*,
  2012 WL 1994707 (S.D.N.Y. June 4), *aff'd sub nom. Iconix Brand Grp. Inc.
  v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 505 F. App'x 14 (2d Cir. 2012) ...................16

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010) .................................................................................... *passim*

*In re Noah Educ. Holding, Ltd. Sec. Litig.*,
  2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) ....................................................................16

*In re Parmalat Sec. Litig.*,
  376 F. Supp. 2d 449 (S.D.N.Y. 2005) ................................................................................34

*In re Poseidon Concepts Sec. Litig.*,
  2016 WL 3017395 (S.D.N.Y. May 24, 2016) .....................................................................28

*In re Satyam Comput. Servs. Ltd. Sec. Litig.*,
  915 F. Supp. 2d 450 (S.D.N.Y. 2013) ................................................................................29

*In re Smart Techs., Inc. S'holder Litig.*,
  295 F.R.D. 50 (S.D.N.Y. 2013) ..........................................................................................28

*In re Sterling Foster & Co. Sec. Litig.*,
  222 F. Supp. 2d 216 (E.D.N.Y. 2002) ...............................................................................19

*In re Terrorist Attacks on Sept. 11, 2001*,
  714 F.3d 659 (2d Cir. 2013) .........................................................................................32, 33

*In re Terrorist Attacks on Sept. 11, 2001*,
  718 F. Supp. 2d 456 (S.D.N.Y. 2010), *aff'd*, 714 F.3d 109 .................................................33

*In re Ultrafem Inc. Sec. Litig.*,
  91 F. Supp. 2d 678 (S.D.N.Y. 2000) ..................................................................................19

*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F. Supp. 2d 512 (S.D.N.Y. 2011), *aff'd*, 838 F.3d 223 (2d Cir. 2016) ............................29

*In re WorldCom, Inc. Sec. Litig.*,
  2004 WL 1435356 (S.D.N.Y. June 28, 2004) ........................................................................19

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945).................................................................................................................37

*Iragorri v. United Techs. Corp.*,
  274 F.3d 65 (2d Cir. 2001)...........................................................................................38, 39, 40

*Jazini v. Nissan Motor Co.*,
  148 F.3d 181 (2d Cir. 1998).....................................................................................................32

*King Cty. v. IKB Deutsche Industriebank AG*,
  769 F. Supp. 2d 309 (S.D.N.Y. 2011)......................................................................................33

*Langan v. Johnson & Johnson Consumer Cos., Inc.*,
  897 F.3d 88 (2d Cir. 2018).......................................................................................................30

*LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*,
  318 F.3d 148 (2d Cir. 2003)......................................................................................................14

*Licci v. Lebanese Canadian Bank, SAL*,
  732 F.3d 161 (2d Cir. 2013)......................................................................................................34

*Lopez v. Shopify, Inc.*,
  2017 WL 2229868 (S.D.N.Y. May 23, 2017) ..........................................................................36

*Massey v. Litton*,
  99 Nev. 723 (1983) ...................................................................................................................32

*MetLife Ins. Co. v. Robertson-Ceco Corp.*,
  84 F.3d 560 (2d Cir. 1996).......................................................................................................33

*Milan v. Wertheimer*,
  808 F.3d 961 (2d Cir. 2015)......................................................................................................11

*Mori v. Saito*,
  2013 WL 1736527 (S.D.N.Y. Apr. 19, 2013)..........................................................................12

*Morrison v. Nat'l Austl. Bank Ltd.*,
  561 U.S. 247 (2010).................................................................................................5, 28, 29, 30

*NCA Holding Corp. v. Ernestus*,
  1998 WL 388562 (S.D.N.Y. July 13, 1988) ............................................................................34

*New Jersey Carpenters Health Fund v. Residential Capital, LLC,*
  2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010) ........................................................25

*New Jersey Carpenters Health Fund v. Residential Capital, LLC,*
  2011 WL 2020260 (S.D.N.Y. May 19, 2011) ........................................................20

*Nolfi v. Ohio Kentucky Oil Corp.,*
  675 F.3d 538 (6th Cir. 2012) ...............................................................................12

*P. Stolz Family P'ship L.P. v. Daum,*
  355 F.3d 92 (2d Cir. 2004)....................................................................................26

*Parkcentral Global Hub. Ltd. v. Porsche Auto. Holdings SE,*
  763 F.3d 198 (2d Cir. 2014)..................................................................................12

*Pell v. Weinstein,*
  759 F. Supp. 1107 (M.D. Pa. 1991), *aff'd,* 961 F.2d 1568 (3d Cir. 1992) .............12

*Phillips v. Reed Grp., Ltd.,*
  955 F. Supp. 2d 201 (S.D.N.Y. 2013).....................................................................34

*Pinter v. Dahl,*
  486 U.S. 622 (1988)...................................................................................... *passim*

*Pollux Holding Ltd. v. Chase Manhattan Bank,*
  329 F.3d 64 (2d Cir. 2003)....................................................................................38

*PT United Can Co. v. Crown Cork & Seal Co.,*
  138 F.3d 65 (2d Cir. 1998)...............................................................................37, 38

*Rayner v. E*TRADE Fin. Corp.,*
  248 F. Supp. 3d 497 (S.D.N.Y. 2017), *aff'd,* 899 F.3d 117 (2d Cir. 2018). .............6

*Red Rock Holdings, Ltd. v. Union Bank Trust Co., Ltd.,*
  1998 WL 474094 (S.D.N.Y. Aug. 11, 1998), *aff'd as modified*, 181 F.3d 83
  (2d Cir. 1999)........................................................................................................37

*Reliance First Capital, LLC v. Mid Am. Mortg., Inc.,*
  2019 WL 2504039 (E.D.N.Y. June 17, 2019) ........................................................36

*Rensel v. Centra Tech, Inc.,*
  2019 WL 2085839 (S.D. Fla. May 13, 2019) .........................................................22

*Richards v. Direct Energy Servs. LLC,*
  915 F.3d 88 (2d Cir. 2019)....................................................................................30

*Rombach v. Chang,*
  355 F.3d 164 (2d Cir. 2004)..................................................................................23

*Rosenzweig v. Azurix Corp.*,
   332 F.3d 854 (5th Cir. 2003) ...................................................................21

*Royalty Network Inc. v. Dishant.com, LLC*,
   638 F. Supp. 2d 410 (S.D.N.Y. 2009)......................................................35

*Sanderson v. Roethenmund*,
   682 F. Supp. 205 (S.D.N.Y. 1988) ...........................................................17

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946)..............................................................................2, 10

*Shah v. Meeker*,
   435 F.3d 244 (2d Cir. 2006), *abrogated on other grounds by Merck v.*
   *Reynolds*, 559 U.S. 633 (2010) ................................................................16

*Shain v. Duff & Phelps Credit Rating Co.*,
   915 F. Supp. 575 (S.D.N.Y. 1996) .....................................................21, 22

*Singleton v. Clash*,
   951 F. Supp. 2d 578 (S.D.N.Y. 2013), *aff'd sub nom. S.M. v. Clash*, 558 F.
   App'x 44 (2d Cir. 2014)............................................................................14

*Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*,
   450 F.3d 100 (2d Cir. 2006)......................................................................34

*State v. Eaton*,
   101 Nev. 705 (Nev. 1985) *overruled on other grounds by State ex rel. Dep't*
   *of Transp. v. Hill*, 963 P.2d 480 (Nev. 1998)...........................................32

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*,
   2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001)....................................20, 21, 22, 23

*Sterling Trust Co. v. Adderly*,
   168 S.W.3d 835 (Tex. 2005).....................................................................32

*Stone v. Enstam*,
   541 S.W.2d 473 (Tex. Civ. App. 1976) ....................................................31

*Tagger v. Strauss Grp. Ltd.*,
   2018 WL 4356725 (E.D.N.Y. Sept. 12, 2018) .........................................38

*Teva Pharm. Indus. Ltd. v. Deutsche Bank Sec. Inc.*,
   2010 WL 6864006 (S.D.N.Y. Dec. 14, 2010) ..........................................12

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976)..................................................................................23

*United States v. Georgiou*,
    777 F.3d 125 (3d Cir. 2015)....................................................................28

*United States v. Naftalin*,
    441 U.S. 768 (1979)..............................................................................19

*Wave Studio, LLC v. Gen. Hotel Mgmt.*,
    2017 WL 972117 (S.D.N.Y. Mar. 10, 2017) ...........................................39

*Wilson v. Saintine Expl. & Drilling Corp.*,
    872 F.2d 1124 (2d Cir. 1989)...............................................................20

*Youngers v. Virtus Inv. Partners, Inc.*,
    195 F. Supp. 3d 499 (S.D.N.Y. 2016)....................................................22

*Zakinov v. Ripple Labs, Inc.*,
    2020 U.S. Dist. LEXIS 32982 (N.D. Cal. Feb. 26, 2020) .........................19

*Zirvi v. Flatley*,
    433 F. Supp. 3d 448 (S.D.N.Y.), *aff'd*, 2020 WL 7294559 (2d Cir. Dec. 11, 2020) ...................................................................................................17

*Zola v. Gordon*,
    685 F. Supp. 354 (S.D.N.Y. 1988) .........................................................18

**Statutes and Rules**

Federal Rules of Civil Procedure
    Rule 9(b) ............................................................................................17
    Rule 12(b)(1) ........................................................................................1
    Rule 12(b)(2) ........................................................................................1
    Rule 12(b)(6) ........................................................................................1

N.Y. CPLR § 302(a)(1)............................................................................34

Securities Act of 1933
    Section 12(a)(1), 15 U.S.C. § 77*l* (a)(1) ............................................. *passim*
    Section 12(a)(2), 15 U.S.C. § 77*l* (a)(2) ............................................. *passim*
    Section 13, 15 U.S.C. § 77m...................................................................12
    Section 15, 15 U.S.C. § 77o...........................................................11, 32

Nev. Rev. Stat. § 90.660 .........................................................................30

Nev. Rev. Stat. § 90.670 .........................................................................31

Texas Rev. Civ. Stat. art. § 581-33 A .......................................................31

**Other Authorities**

Singapore Const. § 153A ....................................................................................................35

*Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act
    of 1934: The DAO* (Exchange Act Release No. 81207) (July 25, 2017) ...............................10

Defendants TRON Foundation ("TRON") and Justin Sun respectfully submit this memorandum of law in support of their motion to dismiss the Amended Class Action Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6), or in the alternative, pursuant to the doctrine of *forum non conveniens*.

## PRELIMINARY STATEMENT

This case arises from an offshore initial offer and sale of a digital currency, or token, known as "TRX."  Plaintiffs allege that this offering, which they call an "initial coin offering," or "ICO," occurred between "on or about August 24, 2017" and September 2, 2017.  Plaintiffs concede that they did not purchase any TRX in the so-called ICO.  Nor do they allege that any U.S. citizens did so or had any contact with TRON, which was formed under the laws of Singapore and based in China at the time of the ICO.  To the contrary, the three named plaintiffs did not begin to trade TRX until much later (plaintiffs Hardin and Muhammad on March 29, 2018, and plaintiff Williams, who bought and sold on only a single day, May 8, 2019).  Each plaintiff bought TRX on the secondary market (from unspecified sellers) through a foreign exchange, known as Binance, which is based in Malta.

Nearly three years after TRON's initial offering of TRX, plaintiffs brought this action under U.S. laws in New York—a state with ***no connection*** to the parties (one plaintiff is a citizen of Nevada, the other two of Texas) or the offering.  Plaintiffs allege that the offering was an unlawful sale of an "unregistered security," and that TRON misled plaintiffs by not disclosing, principally, that TRX was a security.  On those grounds, plaintiffs have attempted to assert primary liability claims under federal and state securities laws against TRON, and a "control person" claim against TRON's founder, Justin Sun, who is domiciled in Hong Kong.  Although plaintiffs' contention that TRX is a security is wrong, defendants do not rely on that ground in seeking dismissal.  That is because the Complaint is fatally flawed in numerous other respects.

*First*, both the "unregistered offering" claim under Section 12(a)(1) of the Securities Act of 1933 (the "Securities Act"), and the "misrepresentation" claim under Section 12(a)(2) of the Securities Act, are untimely on their face.  The initial TRX offering occurred in 2017, and plaintiffs filed this action in 2020, long after the expiration of the one-year statute of limitations for such claims.  Plaintiffs seek to invoke a "discovery rule" to salvage their untimely Section 12(a)(1) claim, alleging that they could not have discovered the facts underlying their claim until April 3, 2019, when the staff of the Securities and Exchange Commission ("SEC") summarized previous guidance through a laundry-list of factors (the "Framework") one could  consider in assessing whether particular digital currencies might be securities under a seventy-five-year-old Supreme Court decision, *SEC v. W.J. Howey Co*., 328 U.S. 293 (1946).  But since Section 12(a)(1) is ***not*** subject to a "discovery" rule, that assertion does not help plaintiffs (and regardless of its lack of merit).

Nor is plaintiffs' reliance on the Framework sufficient to resuscitate their Section 12(a)(2) claim (for a supposed "misleading" whitepaper issued before the "ICO" in 2017 alleged to be a "prospectus").  This claim was not even pleaded in the original complaint, and it is nothing but a litigation afterthought.  While Section 12(a)(2) is subject to a discovery rule, it applies only where a plaintiff was unable to discover the ***facts*** necessary to assert a claim during the limitations period.  Nothing about the SEC staff Framework is factual.  Nor did the Framework effect any change in the law.  To the contrary, the Framework expressly states that it "[i]s ***not*** a rule, regulation, or statement of the Commission, and the Commission has neither approved nor disapproved its content," and that it "does ***not*** replace or supersede existing case law, legal requirements, or statements or guidance from the Commission or Staff" (emphasis added).  Accordingly, plaintiffs' supposed "reliance" on the Framework as the basis for their

claim that TRON misrepresented that TRX was not a security fails as a matter of law.  Indeed, to underscore the point, two of the plaintiffs continued to buy and sell TRX even after the Framework (and plaintiff Williams' only trades occurred afterwards), actions that belie that the Framework suddenly and for the first time supplied them with preternatural insight that TRX was an unregistered security.  Equally unavailing is the throwaway assertion that defendants fraudulently concealed that TRX was a security, which is circular and unsupported by the requisite particularized facts.

Finally, plaintiffs' effort to assert other "misrepresentation" claims (that TRON's whitepaper was "plagiarized" and the like) are also untimely.  Although these new claims were asserted for the first time on August 24, 2020 (in the Amended Complaint), plaintiffs make no effort to allege how and why they were not "discoverable" until one year earlier.  Because they do not "relate back" to the original complaint that contained no Section 12(a)(2) claim, and because they are untimely even if they were to relate back, these claims too should be dismissed.

**Second**, plaintiffs' Section 12(a)(1) and 12(a)(2) claims fail because they do not apply to purchases in the secondary market (as opposed to the *initial* distribution of TRX by TRON).  *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 571-72 (1995).  Plaintiffs admit that all of their purchases were made only in the secondary market.  Furthermore, plaintiffs do not allege that *anyone* in the U.S. purchased in the 2017 initial distribution.

**Third**, plaintiffs' claims fail because they have not adequately pleaded that TRON was a "statutory seller" under Section 12 (there is no claim that Mr. Sun was a statutory seller).  Plaintiffs concede that TRON did not sell or pass title of TRX to plaintiffs.  And while they make some generalized allegations of "solicitation" in the form of tweets or other statements about the availability of TRX, such allegations are insufficient.  What plaintiffs needed to plead,

but cannot, is that they had direct contact with TRON about their purchases (or were even aware of TRON's generalized statements), *and* that TRON stood to gain financially from the supposed "solicitation" of plaintiffs, as the law plainly requires. *See Pinter v. Dahl*, 486 U.S. 622, 643-47 & n.21 (1988).

*Fourth*, plaintiffs have not adequately pleaded a material misrepresentation or omission to support their Section 12(a)(2) claim. Indeed, as noted, this claim ***was not even alleged*** in the original complaint, and apparently was added as an afterthought solely in the hope that the "discovery rule" would make at least one of plaintiffs' claims timely (which it does not). In any event, the gravamen of plaintiffs' claim is that TRON incorrectly determined and disclosed that TRX was not a security in a whitepaper issued around the time of the alleged ICO in 2017. But plaintiffs cite no contemporaneous facts available to TRON at the time which show that its statements were false when they were made. In fact, TRON's statements were accompanied by cautionary language indicating that there were inherent uncertainties associated with the regulatory environment for TRX. Indeed, according to plaintiffs, no one could have "discovered" that such digital currencies or tokens were securities until the Framework was issued almost two years later – long after the whitepaper and ICO. Plaintiffs cannot have it both ways—it cannot be simultaneously true that it was impossible to know that TRX was a security until the Framework in 2019 *and* that TRON secretly knew TRX was a security in 2017 but lied and covered up that "fact" when it distributed TRX in mid-2017. Obviously, TRON was not required to disclose or predict in the whitepaper (or anywhere else) what guidance might be contained in a Framework that did not even exist at the time. Equally conclusory and inadequate are allegations regarding supposed plagiarism (based on similarities between TRON's whitepaper and those of other companies) or supposed exaggeration of TRON's prospects,

particularly in light of disclosed risks and uncertainties.

*Fifth*, the U.S. securities laws do not apply extraterritorially.  *See Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 267 (2010).  Plaintiffs have not identified any transactions listed on a domestic exchange or domestic transactions in alleged securities.  Plaintiffs purchased nothing from TRON, in the U.S. or elsewhere, but instead voluntarily reached out to a foreign exchange to purchase tokens issued by a Singapore company.  While plaintiffs allege that they are U.S. citizens, that alone is insufficient to invoke the federal securities laws.

*Sixth*, plaintiffs are residents of Nevada and Texas, and yet they attempt to bring unregistered offering claims under the laws of those states *and* virtually every other state in the country, the District of Columbia and Puerto Rico.  For substantially the same reasons as those set forth above, the Nevada and Texas claims fail as a matter of law.  Plaintiffs have no legal basis to invoke the barrage of other laws, and hence defendants need not brief further deficiencies with respect to them.

*Seventh*, personal jurisdiction over Mr. Sun, who is domiciled in Hong Kong, and TRON, is lacking. There is no claim that Mr. Sun is subject to general jurisdiction, which means plaintiffs must allege adequate fact to support specific jurisdiction over him.  Plaintiffs, however, have not and cannot show their claims arise out of Mr. Sun's limited, sporadic contacts with New York (or occasional contacts with the United States), which is needed to establish specific personal jurisdiction.  Likewise, plaintiffs' reliance on specific jurisdiction allegations as to TRON are deficient, since nothing TRON is alleged to have done in the United States relates to the ICO or plaintiffs' purchases and sales of TRX.  Moreover, even if personal jurisdiction did exist, there is no legitimate reason for the case to proceed in New York, where no party is located and which is convenient only to plaintiffs' counsel.  A better, more convenient forum for this

dispute involving a Singapore company (and a Hong Kong individual defendant), and TRX sold

on a foreign exchange, is available in Singapore, and defendants therefore also seek dismissal on

the grounds of *forum non conveniens*.

## FACTUAL BACKGROUND

### A.    Defendants

TRON is a blockchain-focused foundation formed in Singapore.  Dkt. No. 29 ("Amended

Complaint" or "Compl.") ¶ 21.  TRON was founded on the premise that internet traffic, data and

content have become too centralized. Ex. 1 (TRON "Whitepaper" v. 1.8), Preface.[1]  TRON thus

created an online platform designed to democratize and decentralize online content, such as web

applications, so that the content creators would retain more control over it.  *Id.*  Thus far, TRON

has been incredibly successful in creating a free online content and entertainment platform.  That

platform currently hosts more than 2,000 decentralized web applications, known as "DApps,"

which run on open source software and leverage blockchain technology.  The platform currently

serves more than 16 million user accounts and has processed more than 1.3 billion transactions.

At the time of the alleged ICO, TRON did not have any offices or operations in the

United States, and plaintiffs do not allege otherwise.  Instead, TRON conducted business from

East Asia, including Hong Kong and China.  *See* Compl. ¶ 21; *see also* Sun Decl. ¶ 5.  Plaintiffs

allege that TRON opened a California office in November 2017, three months after the ICO, but

they do not contend it is in any way connected to the ICO or plaintiffs' trading in TRX, much

---

[1] All exhibit references are to the accompanying Declaration of Casey O'Neill ("O'Neill Decl."). As outlined in the accompanying Notice of Documents Incorporated by Reference and Request for Judicial Notice, in deciding a motion to dismiss, the Court may consider documents such as TRON's whitepaper "that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit . . . ."  *Rayner v. E\*TRADE Fin. Corp.*, 248 F. Supp. 3d 497, 500 (S.D.N.Y. 2017) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)), *aff'd*, 899 F.3d 117 (2d Cir. 2018).

less that plaintiffs had any contact with it.  *See* Compl. ¶ 21; *see also* Dkt. No. 23 (purporting to have served TRON at its headquarters in Singapore, not in California).

Defendant Justin Sun is TRON's co-founder.  Compl. ¶ 22.  Mr. Sun was born a citizen of mainland China and is currently a citizen of St. Kitts.  Sun Decl. ¶ 2.  Mr. Sun is domiciled in Hong Kong, where he has a Hong Kong working visa, Hong Kong identity card and maintains his permanent residence.  *Id.*[2]

### B.  Initial Token Offering

As alleged, between August 24 and September 2, 2017, TRON initially offered for sale a digital "token" called TRX.  Compl. ¶¶ 1, 63, 70, 151; *see also* Dkt. No. 1 ¶ 52 (in the initial complaint, alleging a still shorter ICO period of three days, from August 31 to September 2). The first sale of such a token is sometimes colloquially referred to as an initial coin offering, or ICO.  Compl. ¶ 8.  TRON's stated purpose for the offering, as described in the 2017 whitepaper TRON published to describe its online platform, was to create a digital token that could act as a medium of exchange for users of its platform.  *Id.* ¶ 5.

In recent years, digital tokens have become an increasingly common medium through which participants in a blockchain-based project can exchange value.  *Id.* ¶¶ 50-51.  Depending on the characteristics of the project, the token's functionality may be analogous to that of frequent flier miles or hotel award points, which permit a holder to use or access the underlying consumer ecosystem.  *Id.* ¶ 3.  Typically, transactions or exchanges of value within such an environment are verified in a decentralized manner by market participants who run software that confirms and records the transactions.  Blocks of verified transactions are periodically added to a

---

[2] TRON's other co-founder and its former Chief Technology Officer is Defendant Zhiqiang (Lucien) Chen.  Compl. ¶ 23.  Mr. Chen is believed to reside in mainland China and has not appeared in this litigation.

ledger, and hence the term blockchain developed to describe the ledger.  *Id.* ¶ 2.

In the case of TRX, TRON conducted an initial offering of forty (40) billion units of the token, selling those units to prospective users of TRON's entertainment platform for the digital equivalent of approximately seventy (70) million U.S. dollars.  *Id.* ¶¶ 52, 62.  As is typical for a token launch, certain third-party exchanges—online platforms that match buyers and sellers—facilitated the initial sale of TRX.  *Id.* ¶ 63.  Significantly, plaintiffs do not allege that they purchased in the ICO, or that any U.S. citizens did so.  After the initial token distribution, the exchanges kept TRX "listed," that is, tradable, on their platforms.  *Id.* ¶¶ 139-43.  Plaintiffs contend TRON used its so-called listing agreements with these exchanges to target U.S. purchasers, *id.* ¶¶ 136-37, but, crucially, plaintiffs do not allege that TRON made any sales of TRX to plaintiffs or others in the United States in this manner.

## C.     Secondary Market Purchases

The three lead plaintiffs in this action, Corey Hardin ("Hardin") (of Nevada) and David Muhammad ("Muhammad") and Chase Williams ("Williams") (both of Texas), did not purchase TRX during the initial offering.  Compl. Exs. A-C.  Hardin and Muhammad both purchased for the first time in the secondary market, on March 29, 2018, *seven months* after the 2017 initial offering had concluded.  *Id.* Exs. A, B.  Williams's *only* trading in TRX occurred on a single day almost two years later, May 8, 2019, when he purchased and sold TRX (incurring an alleged $139 loss).  *Id.* Ex. C.  The Amended Complaint does not assert that any plaintiff purchased TRX from TRON.  Instead, each plaintiff purchased from an open market counterparty, on the exchange Binance, *id.* Exs. A-C, which is a foreign exchange based in Malta.  In other words, apparently from their residences in Nevada and Texas, plaintiffs traded in TRX solely by utilizing a foreign exchange based overseas to purchase not from TRON, but from an unknown counterparty.

Despite having not purchased during the initial offering or from TRON, plaintiffs attempt to form a nexus between their purchases and alleged marketing activities by TRON.  Plaintiffs claim that, in the months and years *after* the 2017 initial offering, TRON made statements on social media, the TRON website and elsewhere which marketed TRX and "promoted and enabled" secondary market purchases and sales.  *Id.* ¶¶ 65-66.  But all companies engage in promotional activities.  That unremarkable fact does not, itself, constitute a "solicitation" of anyone anywhere in the world who decides to purchase or sell their alleged securities.  In any event, the Amended Complaint does not allege that any plaintiff received, reviewed or relied upon, or was even aware of, TRON marketing statements in deciding to purchase TRX in the secondary market.

Plaintiffs also posit that their secondary market transactions between 2018 and 2020 relate to the much earlier whitepaper TRON published in 2017 (which plaintiffs label a "prospectus"), and they attack the contents of that document.  Based on the unremarkable fact that the whitepaper contains some statements very similar to those made by other token companies, plaintiffs regurgitate the inflammatory allegation – made publicly by others in early 2018 – that TRON "plagiarized" portions of it (*id.* ¶¶ 85-91), and that TRON made other misrepresentations regarding the state of the TRON project's development, promise, utility and decentralization (*id.* ¶¶ 92-106).  The Amended Complaint does not, however, assert that any plaintiff knew of or read any version of the whitepaper, or why they delayed until August 2020 to assert these allegations.  Had plaintiffs read the whitepaper, they would have seen that TRON warned that although TRX was not intended to be a security, future government oversight or regulatory actions could affect TRON and the TRX token, including the "price and stability" of the token and its use on the blockchain.  Ex. 1 §§ 14-15, Risks and Disclaimers.

### D.      SEC Staff "Framework"

Plaintiffs' central assertion is that TRON said in 2017 that the token was not a security, when, in fact, it was.  *See e.g.*, Compl. ¶ 105.  Plaintiffs further allege that based on TRON's statements and publicly available information a reasonable person would not have concluded TRX was a security until April 3, 2019.  *Id.* ¶¶ 71-78, 104.  On that date, staff from the SEC issued informal interpretive guidance, called a "Framework for 'Investment Contract' Analysis of Digital Assets", which outlines a broad array of factors – 38 separate considerations spanning 13 pages – that would be germane to determining whether a token was a security under *Howey* and associated caselaw.  Compl. ¶¶ 13, 104.  Notably, the Framework discloses that it is merely the non-authoritative views of certain SEC staff members, not the presidentially appointed Commissioners who constitute the Commission: "[t]he [Framework] is ***not*** a rule, regulation, or statement of the Commission, and the Commission has neither approved nor disapproved its content."  Ex. 2 at 1 n.1 (emphasis added).  Even more to the point, the Framework states that it "does ***not*** replace or supersede existing case law, legal requirements, or statements or guidance from the Commission or Staff.  Rather, the framework provides additional guidance in the areas that the Commission or Staff ***has previously addressed***."  *Id.* (emphasis added, citing *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* (Exchange Act Release No. 81207) (July 25, 2017) (the "DAO Report").  By contrast, the DAO Report cited by the Framework as prior SEC guidance, ***is*** an authoritative statement of the Commission itself, ***and it precedes the offering of the TRX token*** in August 2017.  *See* Ex. 4.  In the DAO Report, the Commission found that the digital asset at issue was a security.  *Id.* Further, simultaneous with the Commission's issuance of the DAO Report, the SEC issued an "Investor Bulletin [about] Initial Coin Offerings," aimed at potential purchasers of digital assets (like plaintiffs).  Ex. 5.  In the July 25, 2017 Bulletin, the SEC's Office of Investor Education

stated: "Depending on the facts and circumstances of each individual ICO, the virtual coins or tokens that are offered or sold may be securities. If they are securities, the offer and sale of these virtual coins or tokens in an ICO are subject to the federal securities laws." *Id.*

### E.     Claims Asserted

Plaintiffs claim that through the offer and sale of TRX: (1) TRON violated (i) Section 12(a)(1) of the Securities Act by conducting an offering of unregistered securities, (ii) Section 12(a)(2) of the Securities Act by selling securities with a false and misleading prospectus, and (iii) unregistered securities offering statutes in virtually every state and certain territories; and (2) Mr. Sun is liable as a "control person" under Section 15 of the Securities Act and state law.

## PROCEDURAL HISTORY

Plaintiff Williams commenced this action on April 3, 2020, exactly one year after the publication of the Framework.[3]  On June 8, 2020, Williams, Hardin and Muhammad moved for appointment as lead plaintiffs.  Dkt. No. 18.  On June 30, 2020, the Court granted that motion. Dkt. No. 25.  Williams, Hardin and Muhammad filed an Amended Complaint on August 24, 2017.  Dkt. No. 29.

## LEGAL STANDARD

A complaint fails where it lacks "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  On a motion to dismiss, a court "need not accept conclusory allegations or legal conclusions couched as factual [] allegations." *Milan v. Wertheimer*, 808 F.3d 961, 963 (2d Cir. 2015) (internal quotation marks omitted). "Bald assertions and conclusions of law will not suffice to avoid dismissal, nor will factual

---

[3] Another individual, Alexander Clifford, initiated the action with Williams but did not move for lead plaintiff appointment and has been voluntarily removed as a named plaintiff.

allegations that are wholly conclusory." *Allen v. Credit Suisse Sec. (USA) LLC*, 895 F.3d 214, 222 (2d Cir. 2018) (internal citation and quotation marks omitted).

## ARGUMENT

## I.   PLAINTIFFS' SECTION 12 CLAIMS ARE TIME-BARRED

Dismissal is warranted if it is evident from the face of the complaint that the claim is time-barred. *Parkcentral Global Hub. Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 208-09 (2d Cir. 2014). A plaintiff bears the burden to "affirmatively plead that the claim is not barred under the statute of limitations." *Mori v. Saito*, 2013 WL 1736527, at *3 (S.D.N.Y. Apr. 19, 2013); *see also Beres v. Thomson McKinnon Sec., Inc.*, 1987 WL 16977, at *11 (S.D.N.Y. Sept. 10, 1987) ("plaintiff must plead and prove facts showing that he is within the statute"). Plaintiffs have not – and cannot – meet that burden.

### A.   The Section 12(a)(1) Claim Is Untimely

An action under Section 12(a)(1) is untimely "unless brought within one year after the violation upon which it is based." 15 U.S.C. § 77m. No "discovery rule" applies to this claim. *Compare id.* (action under Section 12(a)(1) is untimely "unless brought within one year after the violation upon which it is based"), *with id.* (action brought under Section 12(a)(2) is untimely unless "brought within one year after the discovery of the untrue statement or the omission"); *Teva Pharm. Indus. Ltd. v. Deutsche Bank Sec. Inc.*, 2010 WL 6864006, at *2 (S.D.N.Y. Dec. 14, 2010) ("As the text demonstrates, § 12(a)(1) is not subject to a discovery rule.").[4]

---

[4] *See also Cook v. Avien, Inc.*, 573 F.2d 685, 691 (1st Cir. 1978) (for Section 12(a)(1), "the limitations period runs from the date of the violation irrespective of whether the plaintiff knew of the violation"); *Pell v. Weinstein*, 759 F. Supp. 1107, 1111 (M.D. Pa. 1991) ("neither the discovery rule nor equitable tolling are applicable to the one-year limitation period governing nonregistration claims because the language of the statute militates against such an application, and there is little justification for the application of this rule outside fraud-based causes of action"), *aff'd*, 961 F.2d 1568 (3d Cir. 1992); *Nolfi v. Ohio Kentucky Oil Corp.*, 675 F.3d 538, 553 (6th Cir. 2012) ("Because the statute permits claims under § 12(a)(2) to proceed if brought

Here, as noted above, the "alleged" violation is TRON's sale of "unregistered securities" in the ICO between "about" August 24 and September 2, 2017.  There was no registration statement associated with that offering, TRON stated its view that TRX was not a security, and thus it was evident that TRX had not been registered as a security.  Any Section 12(a)(1) claim therefore lapsed long before this suit was filed over two and one-half years later on April 3, 2020.  And because the "discovery rule" has no application to a claim under Section 12(a)(1), plaintiffs' allegation that the Framework issued on April 3, 2019 somehow caused investors to "discover" for the first time that TRX was an unregistered security (or should have been registered) could not save this claim even if it had merit, which it does not (as discussed below for the Section 12(a)(2) claim).

While it is not entirely clear, plaintiffs' only other assertion is equally wanting.  Plaintiffs seem to claim that TRON's "continuous systematic marketing" of TRX in the years after the ICO somehow gives rise to a "continuous" claim that, apparently, can never expire as long as TRX is bought and sold in the secondary market.  Compl. ¶¶ 9, 65.  Section 12, however, does not even apply to secondary market transactions.  As the Supreme Court has held, Section 12 is limited to the initial distribution of securities, ***not*** aftermarket transactions.  *See Gustafson*, 513 U.S. at 571-72; *In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 588 (S.D.N.Y. 2005) (claim under Section 12 "may only be maintained by a purchaser who purchased stock in the public offering at issue rather than in a secondary market transaction"); *see also* § II(A), *infra*.  Further, other courts have rejected plaintiffs' same argument and found that courts must look to the date of initial sale of the security only.  *See, e.g.*, *In re Biozoom, Inc. Sec. Litig.*, 93 F. Supp. 3d 801,

within one year of discovery of the violation but does not have a similar discovery rule for § 12(a)(1) claims, Congress's intent on this matter is clear and that the express language of the statute should be applied.").

810-11 (N.D. Ohio 2015) (rejecting plaintiffs' continuous offering theory, based on allegations that plaintiffs "continued to promote or offer" after the initial sale, and dismissing Section 12(a)(1) claim where the security was first sold more than a year before suit was filed). Accordingly, the Section 12(a)(1) claim is untimely and fails as a matter of law.

### B.     Section 12(a)(2)'s "Discovery Rule" Does Not Make that Claim Timely

Plaintiffs' Section 12(a)(2) claim fares no better.  The gravamen of plaintiffs' claim sits on the statement in TRON's whitepaper that TRX "is not a security."  Yet, the full context of the whitepaper makes clear that TRON also warned that risks associated with "supervisory regulations" and "regulatory bodies" within the evolving field of blockchain and digital tokens could impact tokens purchased during the ICO.  Put simply, anyone reading the whitepaper, which plaintiffs claim is a "prospectus" in an effort to have it fall within Section 12(a)(2) (limiting claims to securities sold through a prospectus or oral communication), would understand that TRON did not register TRX as a security because it did not believe it was a security.  No *facts* about that were hidden; they were there for anyone to see at the time of the ICO in late August 2017.  *See, e.g.*, *LC Capital Partners, LP v. Frontier Ins. Grp., Inc*., 318 F.3d 148, 154 (2d Cir. 2003) (under the discovery rule, the clock begins to run from discovery of the *facts* giving rise to the cause of action); *see also Singleton v. Clash*, 951 F. Supp. 2d 578, 588 (S.D.N.Y. 2013), *aff'd sub nom. S.M. v. Clash*, 558 F. App'x 44 (2d Cir. 2014).

Plaintiffs fail to allege any *facts* that were not apparent at the time of the ICO or even their purchases, and instead argue that they did not come to *the legal view* that TRX was a security until the SEC staff released the non-binding Framework on April 3, 2019.  *See* Compl. ¶¶ 13, 101, 104, 107-35.  But the Framework reveals no new "facts" about TRON.  Instead, it offers legal guidance, which is wholly inapposite to the discovery rule.  *See Frontera v. United States*, 2009 WL 909700, at *9 (W.D.N.Y. Mar. 31, 2009) ("[I]gnorance of the law does not

warrant application of the diligence discovery rule.").

Nor, in fact, did the Framework change existing law about what may constitute a security under the federal securities laws.  To the contrary, on its face, it expressly indicates that it "is not a rule, regulation or statement of the Commission," and "does not replace or supersede existing case law, legal requirements, statutes or guidance from the Commission."  Ex. 2 at 1 n.1.  Indeed, nearly two years prior, on July 25, 2017, the Commission issued authoritative guidance in the DAO Report and associated Investor Bulletin warning purchasers of digital assets that they may be buying unregistered securities.  Exs. 4 and 5.  That guidance came nearly three years before plaintiffs filed their initial complaint.  Further, on December 11, 2017, SEC Chairman Clayton issued a "Statement on Cryptocurrencies and Initial Coin Offerings," which again warned that digital asset offerings may be unregistered securities offerings, and, in fact, included his opinion that "the structures of initial coin offerings that I have seen promoted involve the offer and sale of securities."  Ex. 6.  Thus, contrary to the picture plaintiffs try to paint—that the Framework constituted a "eureka moment"—since mid-2017, the SEC been issuing a drumbeat of consistent, particularized guidance warning that digital assets offered in ICOs and traded on secondary exchanges may constitute unregistered securities, making clear that plaintiffs cannot claim that they were precluded from discovering they may have a claim under Section 12 until April 2019.[5]

Plaintiffs' remaining allegations, tossed in purely as a litigation afterthought, are also time-barred.  Plaintiffs regurgitate, for example, the public allegation made by others that TRON's whitepaper bears certain similarities to those of other companies (which in itself is

---

[5] Indeed, even plaintiffs do not appear to really believe that the Framework announced "new facts" (or, for that matter, even new "law"), since two of them, Williams and Hardin, continued to purchase TRX after the Framework was issued, and Williams' *only* trades occurred after the Framework was released.

15

unremarkable), and therefore must have been "plagiarized" (Compl. ¶¶ 85-91). But that assertion was in the public domain at least as early as January 2018.[6] The same is true for other alleged misrepresentations, such as the assertion that TRON misrepresented the state of its partnerships or product development. *See id.* Yet plaintiffs neglected to bring this claim for more than two years thereafter. *See In re Merrill Lynch Auction Rate Sec. Litig.*, 2012 WL 1994707, at *4 (S.D.N.Y. June 4) (statute of limitations runs from transaction that triggered liability, which may not necessarily be the last purchase), *aff'd sub nom. Iconix Brand Grp. Inc. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 505 F. App'x 14 (2d Cir. 2012); *Shah v. Meeker*, 435 F.3d 244, 249-50 (2d Cir. 2006), *abrogated on other grounds by Merck v. Reynolds*, 559 U.S. 633 (2010) (news articles trigger inquiry notice; finding that a *single* news article did so and dismissing on that basis). Indeed, since these new "misstatement" claims were raised for the first time in the Amended Complaint filed on August 24, 2020, plaintiffs needed to plead how and why they were discoverable only after August 24, 2019 under the one-year statute of limitations, an effort they do not even try to make. *See In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 528-29 (S.D.N.Y. 2005) (new misrepresentation allegation untimely and does not relate back to original complaint); *In re Noah Educ. Holding, Ltd. Sec. Litig.*, 2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) (same).

### C. Plaintiffs Fail to Allege Fraudulent Concealment as a Basis for Tolling the Statute of Limitations for the Section 12(a)(2) Claim

Finally, buried at the end of the Amended Complaint is a threadbare assertion apparently intended to invoke equitable tolling of the statute of limitations for the Section 12(a)(2) claim. Plaintiffs allege that defendants "deliberately created the impression that TRX was not a

---

[6] *See, e.g.*, Ex. 3 (*TRON Plagiarized Its Whitepaper, Community Claims*, www.coincentral.com, Jan. 11, 2018 (discussing plagiarism allegations)).

security" through "*fraudulent* statements and omissions," thus concealing facts from plaintiffs and preventing them from timely bringing a claim. Compl. ¶¶ 148-49. This claim is pure nonsense (and, of course, inconsistent with their alleged reliance on the Framework as the basis for their claim).

To satisfy the doctrine of fraudulent concealment, a plaintiff must plead, "with particularity . . . : (1) wrongful concealment by the defendant, (2) which prevented the plaintiff's discovery of the nature of the claim within the limitations period, and (3) due diligence in pursuing discovery of the claim." *Butala v. Agashiwala*, 916 F. Supp. 314, 319 (S.D.N.Y. 1996). These elements must meet the exacting standards of Rule 9(b). *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 462 (S.D.N.Y.), *aff'd*, 2020 WL 7294559 (2d Cir. Dec. 11, 2020).

Plaintiffs do not come close. The fact that TRON viewed TRX as "not a security" was plainly stated from the outset. Nothing was hidden. Anyone who bothered to read the 2017 whitepaper knew that. Indeed, plaintiffs do not allege any diligence they did to discover their claim sooner, even if they were "ignorant" of TRON's supposed "misstatements." *See Sanderson v. Roethenmund*, 682 F. Supp. 205, 208 (S.D.N.Y. 1988) ("[M]ere ignorance of the violation on the part of the plaintiff does not toll the limitations period. [ . . . ] Plaintiffs have pled no facts showing that defendants actively misled them or that plaintiffs made even the slightest effort to discover the alleged fraud.").

Moreover, plaintiffs' own allegations belie any notion that TRON affirmatively concealed that TRX was a security. For example, plaintiffs contend it was concealed from them that they were "investing in Defendants' efforts" (Compl. ¶ 148), and that it was not apparent to them that any profit on their investment would depend on the "managerial efforts of others" (*id.* ¶¶ 128-29). Simultaneously, plaintiffs allege that the TRON whitepaper, published in 2017,

featured Mr. Sun's and others' biographies and held out their expertise, credentials and management capabilities as being "integral parts of the success of TRX." *Id.* ¶ 130; *see also id.* ¶ 132 ("And TRON represented that it would provide significant managerial efforts to achieve these objectives and make TRX a success.").  Plaintiffs cannot have it both ways.[7]

Finally, plaintiff do not even try to allege specific, contemporaneous facts showing that TRON intended to "fraudulently conceal" anything.  TRON's whitepaper stated in plain, unequivocal terms that TRX was not a security, while acknowledging there were inherent uncertainties associated with newly emerging blockchain tokens and digital currencies.  Plaintiffs have quarreled with that determination – years after the fact (supposedly because of the Framework) – but have not and cannot plead specific, contemporaneous facts showing TRON did not believe its statement and intentionally concealed anything from TRX purchasers.  Accordingly, plaintiffs have not pled the requisite facts to show "fraudulent concealment" in an effort to make their Section 12(a)(2) claim timely.

## II.    PLAINTIFFS OTHERWISE FAIL TO STATE A VIABLE CLAIM

### A.    Plaintiffs, as Secondary Market Purchasers, Fail to State a Claim Under Section 12

Both Section 12(a)(1) and 12(a)(2) are limited to purchasers in the alleged ICO, not aftermarket or secondary market purchasers.  *See Gustafson*, 513 U.S. at 571-72 ("The 1933 Act is . . . chiefly concerned with . . . offerings of securities – primarily, as here, initial distributions of newly issued stock from corporate issuers") (quoting *Blue Chip Stamps v. Manor Drug Stores*,

---

[7] Equally self-sabotaging, plaintiffs allege that TRON misled them to believe they were purchasing "a decentralized asset that had functionality at issuance" (*id.* ¶ 148), while at the same time they cite the whitepaper that included express warnings about the possibility that TRX would *not* attain the expected functionality (*e.g.*, Ex. 1 § 14 ("The TRON team cannot fully guarantee technological fulfillment.")).  Such inconsistency further underscores the absence of well-pleaded fraudulent concealment.  *Zola v. Gordon*, 685 F. Supp. 354, 362 (S.D.N.Y. 1988) (no tolling or estoppel absent allegations of "responsive, affirmative concealment").

421 U.S. 723, 752 (1975), and *United States v. Naftalin*, 441 U.S. 768, 777-78 (1979) ("[T]he

1933 Act was primarily concerned with the regulation of new offerings")).  A viable Section 12

claim therefore requires that plaintiffs participated in the initial public offering.  *Cosi*, 379 F.

Supp. 2d at 588 (the *Gustafson* court "indicated that a § 12(a)(2) claim may only be maintained

by a purchaser who purchased stock in the public offering at issue rather than in a secondary

market transaction.").

      For that reason, this Court and others in the Second Circuit have repeatedly found that

secondary market purchasers like plaintiffs lack standing; and, have dismissed Section 12 claims

predicated on post-offering, secondary market transactions.  *See, e.g.*, *Cosi*, 379 F. Supp. 2d at

589 (dismissing Section 12(a)(2) claim where plaintiffs failed to allege that they purchased

shares in an initial public offering); *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 693-94

(S.D.N.Y. 2000) ("Purchasers in private or secondary market offerings do not have standing to

bring actions under Section 12[a](2)) (citation omitted); *In re Sterling Foster & Co. Sec. Litig.*,

222 F. Supp. 2d 216, 244-45 (E.D.N.Y. 2002) (collecting cases); *see also In re WorldCom, Inc.*

*Sec. Litig.*, 2004 WL 1435356, at *5 (S.D.N.Y. June 28, 2004) ("[T]he Second Circuit and other

circuit courts have repeatedly observed that purchasers in the secondary market are excluded

from bringing Section 12(a)(2) actions.").[8]

      Plaintiffs have admitted that they did not purchase in the so-called ICO in August and

---

[8] Plaintiffs, in opposition, may try to cite *Zakinov v. Ripple Labs, Inc.*, 2020 U.S. Dist. LEXIS
32982 (N.D. Cal. Feb. 26, 2020).  That case is both non-binding and inapposite.  There, plaintiff
(1) purchased "from defendants" (*id.* at *7-8), (2) purchased during the height of a large offering
by defendants—one aimed at the general public which earned over $1.1 billion in sales (*id.* at
*11-12, 30), and (3) was "motivated to purchase . . . by the promotional activities of Defendants"
(*In re Ripple Labs Inc. Litig.*, Case No. 18-cv-06753-PJH (N.D. Cal.), Dkt. No. 63 ¶ 13).  Such
allegations are lacking here.  Moreover, even if they were present, *Zakinov* simply
misapprehends controlling law: Section 12 does not apply to secondary market transactions.

September 2017.  Rather, plaintiffs Hardin and Muhammad did not begin purchasing TRX until *seven months* after the initial offering.  Plaintiff Williams did not do so until *nearly two years* after the ICO.  Compl. Exs. A-C.  They purchased *not* from TRON, but rather, on the secondary market through exchanges who match buyers and sellers.  Their claims fail as a matter of law. *See New Jersey Carpenters Health Fund v. Residential Capital, LLC*, 2011 WL 2020260, at *3 (S.D.N.Y. May 19, 2011) (dismissing Section 12(a)(2) claim where "purchases were made months or even years after" initial offering); *Wilson v. Saintine Expl. & Drilling Corp.*, 872 F.2d 1124, 1126 (2d Cir. 1989) (noting prior Second Circuit holdings that the two Sections, 12(a)(1) and 12(a)(2), "are identical in meaning").

> ### B.      TRON Is Not a "Statutory Seller" Under Section 12

Liability under Section 12 is limited to a specific and narrow set of participants in securities transactions: "statutory sellers."  *Pinter*, 486 U.S. at 643-47 & n.21.  A defendant is a statutory seller only if it "(1) 'passed title, or other interest in the security, to the buyer for value,' or (2) 'successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve [its] own financial interests or those of the securities['] owner.'"  *Id.* at 642, 647; *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).

There is no allegation that plaintiffs purchased TRX directly from TRON, nor could there be.  *See Cortec. Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 49 (2d Cir. 1991) (Section 12(a)(2) "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, ***a buyer cannot recover against his seller's seller***") (emphasis added); *Credit Suisse First Boston Corp. v. ARM Fin. Grp., Inc.*, 2001 WL 300733, at *10 (S.D.N.Y. Mar. 28, 2001) ("[P]laintiffs here did not purchase directly from [defendant] and thus lack standing under the first prong of *Pinter*"); *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001) ("As plaintiff has alleged

only that NACC was 'part of the chain of title' and not that NACC directly sold the Certificates to it, plaintiff cannot satisfy the first prong of *Pinter*.").[9]

To adequately plead "solicitation" under *Pinter*, a plaintiff must allege both "***direct contact***" with the defendant, *In re Deutsche Telekom AG Secs. Litig.*, 2002 WL 244597, at *5 (S.D.N.Y. Feb. 20, 2002) (emphasis added), and defendant's "***direct and active participation in the solicitation of the immediate sale***," *Steed*, 2001 WL 1111508, at *7 (emphasis added). Further, plaintiff must allege that he "purchased the securities as a result of [that] solicitation." *Id*. And, moreover, a plaintiff must show that the direct and active participation was motivated, at least in part, by defendant's financial interest or that of the securities owner. *See Morgan Stanley Info. Fund*, 592 F.3d at 359; *Ellison v. Am. Image Motor Co.*, 36 F. Supp. 2d 628, 638 (S.D.N.Y. 1999); *see also Shain v. Duff & Phelps Credit Rating Co.*, 915 F. Supp. 575, 583 (S.D.N.Y. 1996) ("*Pinter* requires *both* (1) solicitation and (2) that such solicitation be for financial gain."). Plaintiffs have not, and cannot, adequately allege any of these elements.

Plaintiffs do not allege that they had any direct contact whatsoever with TRON in connection with their TRX trading (or otherwise). The claim fails for that reason alone. *See Deutsche Telekom*, 2002 WL 244597, at *5; *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003) ("To count as 'solicitation,' the seller must, at a minimum, directly communicate with the buyer."). In addition to lacking privity, plaintiffs do not even plead that they received, reviewed or relied upon any sort of indirect sales or marketing correspondence, whether the whitepaper or online marketing, in deciding to purchase TRX. Even if they had, generic,

---

[9] This case stands in stark contrast to *Balestra v. ATBCOIN LLC,* No. 17-cv-10001-VSB (S.D.N.Y.), Dkt. Nos. 1 ¶ 13, 1-1 (alleging that "Plaintiff invested in the ATB ICO . . . by transmitting 2.1 ETH to Defendants" directly and receiving digital currency directly from Defendants' offering).

marketing-related statements do not constitute "direct and active participation in the solicitation of the immediate sale" and are insufficient to establish solicitation under *Pinter.  See, e.g.*, *Youngers v. Virtus Inv. Partners, Inc.*, 195 F. Supp. 3d 499, 522 (S.D.N.Y. 2016) (allegations that defendants "distributed the marketing materials 'through their website and other channels' . . . are insufficient").  Thus, plaintiff's assertions that TRON engaged in general promotional activities, or touted TRON or TRX tokens – much the way almost every company touts its business – come nowhere close to "direct and active participation in the solicitation of the immediate sale" of a security necessary to plead a claim.  *See Steed*, 2001 WL 1111508, at *7; *see also Rensel v. Centra Tech, Inc.*, 2019 WL 2085839, at *4 (S.D. Fla. May 13, 2019) (dismissing Section 12(a)(1) claim where plaintiffs failed to allege that defendant's comments about CTR tokens on Twitter were a "*successful* solicitation, that [defendant] had any contact with Plaintiffs, or that Plaintiffs even saw the posts."); *Shain*, 915 F. Supp. at 581 (defendants "are not liable under § 12 for solicitation unless they directly or personally solicit the buyer.").

Moreover, plaintiffs needed to plead facts showing that any supposed "solicitation" of plaintiffs by TRON was motivated, at least in part, by its own financial interests.  *Pinter*, 486 U.S. at 647; *Morgan Stanley*, 592 F.3d at 359.  Plaintiffs have failed to do so.  Instead, they make the generic allegation that TRON had a general incentive to keep TRX trading prices high because it continued to own TRX.  But that sort of allegation could be made in any case where, for example, a traditional public company continues to own treasury stock.  That argument would render *Pinter's* limitation meaningless.  Instead, plaintiffs needed to allege *facts* showing that TRON's "active and direct solicitation" of them (itself lacking) was somehow motivated by TRON's financial interest (or those of unknown third parties selling on the Binance exchange, which is not alleged either).  *See Deutsche Telekom*, 2002 WL 244597, at *5 ("[B]ald allegations

of solicitation are insufficient to sustain . . . section 12(a)(2) liability as a 'seller'"); *Steed*, 2001 WL 1111508, at *7 (second prong of *Pinter* only satisfied if plaintiff adequately alleges that defendant "actively solicited the sale of the [token] to the plaintiff and did so for financial gain.").

Because plaintiffs cannot satisfy either prong of *Pinter*, the Section 12(a)(1) and 12(a)(2) claims fail.[10]

### C.    Plaintiffs Fail to Plead an Actionable Misrepresentation or Omission under Section 12(a)(2)

The original complaint did not contain any claim under Section 12(a)(2).  Nevertheless, apparently as an afterthought, plaintiffs now try to claim that TRON's 2017 whitepaper was a "prospectus," and that it contained false and misleading statements.  *See* Compl. ¶¶ 105-06.  To plead a claim, plaintiff must show that TRON made a material misstatement in the whitepaper (even assuming *arguendo* it is a prospectus) associated with the ICO.  *See Morgan Stanley*, 592 F.3d at 359 (setting forth elements of prima facie claim under section 12(a)(2)) (quoting 15 U.S.C. § 77*l* (a)(2)).  A material fact is one that a reasonable investor would have viewed as "having significantly altered the 'total mix' of information made available."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  "The test for whether a statement is materially misleading under Section 12(a)(2) is . . . whether representations, viewed as a whole, would have misled a reasonable investor."  *See Rombach v. Chang*, 355 F.3d 164, 178 n.11 (2d Cir. 2004) (citing *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir.

---

[10] *See Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988) ("Although the Supreme Court [in *Pinter*] did not 'take a position on' the scope of a 'seller' for purposes of [Section 12(a)(2)], we previously have held that the language of sections [12(a)(1)] and [12(a)(2)] is identical in meaning.  Accordingly, we shall consider plaintiffs' section [12(a)(2)] claim in light of *Pinter*.") (internal citations omitted); *see also Morgan Stanley*, 592 F.3d at 359.

1991)).  Moreover, an "omission" is actionable only if the prospectus fails to include "a material

fact required to be stated therein or necessary to make the statements therein not misleading."

*Morgan Stanley*, 592 F.3d at 358-59; *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d

171, 182 (S.D.N.Y. 2003) ("A defendant is not required to disclose all known information, but

has a duty to disclose any information that is necessary to make other statements not

misleading."); *see also Cosi*, 379 F. Supp. 2d at 586 (shareholders failed to allege that prospectus

contained material omission).

The Amended Complaint alleges the following categories of misrepresentations or

omissions: (1) TRON incorrectly stated that TRX was not a security and suggested it was not

presently subject to U.S. securities laws (¶¶ 12, 74); (2) TRON said TRX was already a

functional digital asset when it was not (¶¶ 71, 81-83); (3) TRON touted false technical details

about the TRON network's and TRX's utility (¶¶ 71, 80); (4) TRON made projections despite

being "fundamentally incapable of delivering on the promises" (¶¶ 85, 91-92, 94-98); (5) TRON

said it was more decentralized than it was (¶¶ 71, 76, 82); (6) TRON plagiarized its whitepaper

(¶¶ 85-91); and (7) TRON paid ten (10) percent of its TRX tokens to Piewo Huanle Technology

("Piewo"), which it described as an "initial TRON supporter," without disclosing that Mr. Sun

had founded and controlled Piewo (¶ 61).  Plaintiffs contend these misrepresentations and

omissions were "made" in TRON's whitepaper, or versions thereof, published at or about the

time of the initial TRX offering.  *Id.* ¶ 71.  None of the alleged misrepresentations or omissions

is actionable.

*First*, as set forth above, the allegation that TRON "falsely" portrayed that TRX was not

or could not be deemed a security is devoid of contemporaneous facts establishing that, at the

time the statement was made, TRON had falsely expressed its determination.  *Acito v. IMCERA*

*Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) ("[L]ack of clairvoyance simply does not constitute securities fraud").  Plaintiffs identify no facts showing that TRON understood that its statements about TRX were untrue.  *See Iqbal*, 556 U.S. at 678-81 (Allegations that merely assert "a legal conclusion couched as a factual allegation" are "not entitled to be assumed true"); *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 254 (S.D.N.Y. 2004) ("The truth of a statement made in the prospectus is adjudged by the facts as they existed when the registration statement became effective."); *see also New Jersey Carpenters Health Fund v. Residential Capital, LLC*, 2010 WL 1257528, at *6 (S.D.N.Y. Mar. 31, 2010) (dismissing section 12(a)(2) claim and holding that plaintiffs' allegations are impermissibly "pleading by hindsight" because "[t]here is no factual allegation that indicates the [information] described in the documents were incorrect at the time offered.").

Moreover, with respect to the possibility of TRX being deemed a security, plaintiffs are wrong to claim that TRON's whitepaper lacked risk disclosures or "warnings" (Compl. ¶¶ 6, 55). The whitepaper contained disclaimers, including ones which placed plaintiffs on notice of inherent uncertainties associated with the regulatory environment for TRX:

> 14. Risk.
>
> [. . . ]
>
> [A]t present, the government has not formulated an explicit policy about blockchain projects and ICO financing, so participants may suffer from losses caused by future policies.
>
> [ . . . ]
>
> It cannot be denied that in the near future, supervisory regulations will be formed to restrain the fields of blockchain and electronic tokens. If supervisory and regulatory bodies perform a standard management over these fields, **the electronic tokens purchased during the ICO period may be affected.** The impacts include, but are not limited to, price and stability fluctuations and restraints.

Ex. 1 § 14 (emphasis added).

25

Even if TRX were a security (it is not), the whitepaper included sufficient cautionary language to render non-actionable TRON's statement that it believed otherwise.  *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96 (2d Cir. 2004) ("A defendant may not be liable under § 12(a)(2) for misrepresentations in a prospectus if the alleged misrepresentations were sufficiently balanced by cautionary language within the same prospectus such that no reasonable investor would be misled about the nature and risk . . . .") (citing *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) ("Certain alleged misrepresentations . . . are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering.")).

*Second*, the following three categories of alleged misrepresentation are best read together: technical and other disclosures (i) exaggerated TRX's functionality, (ii) exaggerated TRON's utility, and (iii) ignored the fact that TRON was "fundamentally incapable of delivering on the promises."  Compl. ¶ 85.  These allegations fail to state a claim because they are: (a) vague statements of corporate optimism or "puffery" (*e.g.*, "the platform is up and running"); and (b) prospective and aspirational (TRON has a "roadmap for ten years").  *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (Statements are nonactionable if they are "'puffery' [that is] 'too general to cause a reasonable investor to rely on them'") (internal citation omitted); *In re Eros Int'l Sec. Litig.*, 2017 WL 6405846, at *6 (S.D.N.Y. Sept. 22, 2017) ("[G]eneral expressions of corporate optimism" are too indefinite to be actionable under the securities laws.") (internal quotation marks omitted), *aff'd sub nom. Eisner v. Eros Int'l PLC*, 735 F. App'x 15 (2d Cir. 2018).

Additionally, here too, TRON's whitepaper contained disclaimers pertaining to TRON's functionality, utility and capability of delivering on promises, in which TRON warned that its

state of development was in flux and could not guarantee technological fulfillment with respect

to project goals.  *See, e.g.*, Ex. 1 § 14 (disclosing partially mature commercial model with

"unpredictable factors" in the evolution of the blockchain industry; stating: "The TRON team

cannot fully guarantee technological fulfillment.").

*Third*, plaintiffs claim TRON said it was "more decentralized" than it actually was, but

plaintiffs fail to show how that concept is material, and in any event, such statements are fatally

vague, as the level of "decentralization" is not an objective, verifiable fact, and hence is

immaterial as a matter of law.  *See City of Pontiac*, 752 F.3d at 183 ( (finding statements in

offering materials to have been "too general to cause a reasonable investor to rely on them")

(internal quotation and citation omitted); *In re Eros Int'l*, 2017 WL 6405846, at *4-7 (finding

generalized statements about company's "user" base immaterial).

*Fourth*, the Amended Complaint notes similarities between TRON's whitepaper and

others published in the blockchain space.  Plaintiffs then repeat the now-stale, inflammatory

allegation that TRON "plagiarized" its whitepaper.  A pejorative and legally irrelevant assertion

aside, the notion that TRON modeled portions of its whitepaper and protocol after certain aspects

of other blockchain projects is entirely unsurprising and immaterial.  What plaintiffs needed to

allege is that the statements were materially misleading, not the "source" of otherwise truthful

statements.  *See, e.g.*, *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 412-13

(S.D.N.Y. 2009) ("For liability to attach…[Section] 12(a)(2) require[s] not only that the plaintiff

identify a misstatement or omission in the registration statement or prospectus, but also that the

plaintiff demonstrate that the misrepresentation was material.")

*Fifth*, the allegation that TRON somehow made a misstatement because it described

Piewo as "an initial TRON supporter" without disclosing that Mr. Sun founded and controlled

Piewo is flatly wrong.  The whitepaper expressly discloses that Mr. Sun "is the founder of Peiwo . . . ."  Ex. 1 ¶ 13.

### D.    The United States Securities Laws Do Not Apply to Plaintiffs' Transactions

There is an independent reason why plaintiffs' claims fail: the U.S. securities laws do not apply to overseas transactions, and thus this court lacks subject matter jurisdiction over plaintiffs' claims.  *Morrison*, 561 U.S. at 267.  Those laws only apply to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities."  *Id.*; *see Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 66 (2d Cir. 2012) (same); *see also In re Smart Techs., Inc. S'holder Litig.*, 295 F.R.D. 50, 56 (S.D.N.Y. 2013) (holding that *Morrison* applies to Securities Act claims because it creates liability "only where the plaintiff has 'acquir[ed]' or 'purchas[ed]' a security.").  Plaintiffs appear to recognize *Morrison's* domestic transaction requirement when they allege that the putative class and subclass will include only individuals who purchased "in a domestic transaction."  Compl. ¶¶ 151-52.  Plaintiffs err, however, in assuming that every transaction involving a U.S. resident is a domestic U.S. transaction.  That is not the law.

Transactions that meet the *Morrison* test are carefully limited and exclude many transactions made by U.S. residents, including the purchases at issue here.  The first prong of *Morrison*, for domestic exchanges, covers only national securities exchanges registered with the SEC, not unregistered "over-the-counter" exchanges, even if they are located in the United States (although the exchange plaintiffs utilized here, Binance, is not a domestic exchange and is located in Malta).  *See In re Poseidon Concepts Sec. Litig.*, 2016 WL 3017395, at *12 (S.D.N.Y. May 24, 2016); *United States v. Georgiou*, 777 F.3d 125, 135 (3d Cir. 2015).  The second prong of *Morrison*, for "domestic transactions in other securities," is limited to transactions where "irrevocable liability is incurred or title passes within the United States."  *Absolute Activist*, 677

F.3d at 67.  Courts have consistently held that the category "domestic transactions in other

securities" does not include purchases made on foreign exchanges even when an order to

purchase is placed from the United States.  *See, e.g.*, *In re Satyam Comput. Servs. Ltd. Sec. Litig.*,

915 F. Supp. 2d 450, 473 (S.D.N.Y. 2013)  (rejecting argument that "purchases of foreign shares

on foreign exchanges constitute domestic transactions within section 10(b)'s reach because the

buy orders were placed from the United States"); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F.

Supp. 2d 512, 532 (S.D.N.Y. 2011) ("[T]he Court joins other lower courts that have rejected the

argument that a transaction qualifies as a 'domestic transaction' under *Morrison* whenever the

purchaser or seller resides in the United States, even if the transaction itself takes place entirely

over a foreign exchange"), *aff'd*, 838 F.3d 223 (2d Cir. 2016); *Cornwell v. Credit Suisse Grp.*,

729 F. Supp. 2d 620, 624 (S.D.N.Y. 2010) ("[T]o carve out of the new rule a purchase or sale of

securities on a foreign exchange because some acts that ultimately result in the execution of the

transaction abroad take place in the United States amounts to nothing more than the

reinstatement of the conduct test.").

Plaintiffs' claims are not based on transactions in securities listed on domestic exchanges

or domestic transactions in other securities.  Plaintiffs assert only that their TRX purchases all

occurred on the Binance exchange.  Compl. Exs. A-C.  Plaintiffs do not allege that Binance is a

national or domestic exchange.  Nor could they.  In parallel, pending litigation filed in this

district – a case brought by the same plaintiffs here – they admit that Binance was founded in

China, moved to Japan, and is now headquartered in Malta.  *Anderson et al. v. Binance et al.*, 20-

cv-2803-ALC (S.D.N.Y.), Dkt. No. 43 ¶ 24.  In addition, plaintiffs fail to allege that, in

purchasing TRX on Binance, title passed within the United States—a defect plaintiffs cannot

cure, given that Binance is based outside the United States.  *Id.*  Thus, plaintiffs' transactions do

not qualify as "domestic transactions in other securities."  Unable to satisfy either prong of *Morrison*, this court lacks subject matter jurisdiction over plaintiffs' claims.

### E.    The State Law Unregistered Offering Claims Fail Absent Standing or Privity

Plaintiffs' state law unregistered offering claims also fail.  *First*, plaintiffs hail from Nevada and Texas only and do not allege that they purchased TRX in or from any other state or territory.  As such, they are not entitled to bring claims under the blue-sky laws of other states or territories, as they seek to do here.  *See Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 156 (2d Cir. 2017) ("blue-sky laws . . . only regulate[] transactions occurring within the regulating States" (citing *Edgar v. Mite Corp.*, 457 U.S. 624, 641 (1982) (noting that the Court had upheld states' authority to enact blue-sky laws because they only regulated transactions within the regulating states)).  Plaintiffs do not plead any facts showing that their transactions in TRX fall within the scope of the laws of these states and territories.[11]

*Second*, the Nevada unregistered offering claim (Compl. ¶¶ 648-55) and the Texas unregistered offering claim (*id.* ¶¶ 903-10) both contain a privity requirement equivalent to the federal law requirement in *Pinter*.  Nev. Rev. Stat. § 90.660 ("A person who offers or sells . . . is liable to the person purchasing the security."); *Carton v. B & B Equities Grp., LLC*, 2014 WL 4540333, at *6 (D. Nev. Sept. 9, 2014); *Baroi v. Platinum Condo. Dev., LLC*, 914 F. Supp. 2d 1179, 1198 (D. Nev. 2012) ("Pursuant to . . . § 90.660(1), a person who commits certain securities violations, including the sale of unregistered securities, is liable to the person

---

[11] To the extent plaintiffs may attempt to invoke these laws based on "class standing" (despite not possessing the claims themselves), that fails here because, at a minimum, plaintiffs must have personally stated a claim as to some cause of action in order to argue they have "class standing" to invoke statutory claims they cannot personally pursue. *See Richards v. Direct Energy Servs. LLC*, 915 F.3d 88, 106 (2d Cir. 2019); *Langan v. Johnson & Johnson Consumer Cos., Inc.*, 897 F.3d 88, 96 n.3 (2d Cir. 2018).  As set forth above, plaintiffs have failed to state any viable claims against TRON or Mr. Sun.

purchasing the security."); Texas Rev. Civ. Stat. art. § 581-33 A (Any person who offers or sells "is liable to the person buying the security from him"); *Stone v. Enstam*, 541 S.W.2d 473, 480 (Tex. Civ. App. 1976) ("Our examination of the record convinces us that [plaintiff] failed to prove [defendant] was a seller of securities under the Texas Securities Act."); *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 761 F. Supp. 2d 504, 534 (S.D. Tex. 2011) (holding that, like Section 12(a)(2), to state a claim under Texas Rev. Civ. Stat. art. § 581-33 A, "a plaintiff must allege facts showing a primary violation by a 'seller' or 'offeror' that is in privity with the plaintiff."). Thus, the Nevada and Texas statutory claims – the only ones these plaintiffs have standing to assert – fail for the same reasons that their Section 12(a)(1) claim fails.[12]

### F. The Nevada Unregistered Offering Claim Is Time-Barred

Additionally, the Nevada unregistered offering claim brought by plaintiff Hardin is subject to a two-year statute of limitations. Nev. Rev. Stat. § 90.670. The Nevada statute includes a discovery rule: a claim must be brought within "2 years after the discovery of the violation, [or] 2 years after discovery should have been made by the exercise of reasonable care." *Id.*

The fact that TRON believed that TRX was not a security, and that TRON had not registered TRX as a security, was publicly disclosed in the whitepaper issued around the time of the ICO in August 2017. Yet Hardin did not sue until April 2020, more than two years later. For the reasons set forth above, Hardin's allegation that he could not have "discovered" his unregistered security claim until the Framework was published is legally unavailing. *See Baroi*, 914 F. Supp. 2d at 1199 (whether plaintiffs have exercised reasonable care "may be decided as a

---

[12] Defendants reserve the right to fully brief each and every state and territory if the Court so desires. They have not done so now in light of the deficiencies otherwise detailed herein and to alleviate burdens on the Court.

matter of law if the uncontroverted evidence irrefutably demonstrates plaintiff discovered or should have discovered the facts giving rise to the cause of action. The 'focus is on the [plaintiff's] knowledge of or access to facts rather than on her discovery of legal theories.'") (quoting *Massey v. Litton*, 99 Nev. 723 (1983)).

### G. Plaintiffs Fail to Plead Control Person Liability Against Mr. Sun

Because plaintiffs have failed to plead a primary violation by TRON, the control person claims against Mr. Sun likewise fail.  *See Morgan Stanley*, 592 F.3d at 358 ("[T]he success of a claim under section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under sections 11 and 12"); *State v. Eaton*, 101 Nev. 705, 714-15 (Nev. 1985) ("In the absence of the primary liability . . . [there is] no ground for an independent and secondary liability . . . .") *overruled on other grounds by State ex rel. Dep't of Transp. v. Hill*, 963 P.2d 480 (Nev. 1998); *Sterling Trust Co. v. Adderly*, 168 S.W.3d 835, 839 (Tex. 2005) ("Secondary liability is derivative liability for another person's securities violation.").

### III. THE COURT LACKS PERSONAL JURISDICTION OVER MR. SUN AND TRON AND THE FORUM IS INCONVENIENT

To survive a motion to dismiss based on a lack of personal jurisdiction, "a plaintiff must make a prima facie showing that jurisdiction exists."  *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (internal quotation marks omitted).  In analyzing whether a plaintiff has made the necessary showing, courts "will not draw argumentative inferences in the plaintiff's favor . . . nor must [they] accept as true a legal conclusion couched as a factual allegation." *Id.* (internal citation and quotation marks omitted).  "[A]llegations or evidence of activity constituting the basis of jurisdiction must be non-conclusory and fact-specific." *ICO Servs., Ltd. v. Coinme, Inc.*, 2018 WL 6605854, at *2 (S.D.N.Y. Dec. 17, 2018) (citing *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998)).

A plaintiff can establish personal jurisdiction over a defendant in two ways.  "Specific

jurisdiction exists when . . . [the] 'suit aris[es] out of or relate[s] to the defendant's contacts with

the forum'; . . . general jurisdiction, on the other hand, is based on the defendant's general

business contacts with the forum."  *MetLife Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567-

68 (2d Cir. 1996) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408,

414-16 & n.8-9 (1984)).  Here, plaintiffs rely entirely on allegations of specific jurisdiction.  *See*

Compl. ¶¶ 27, 28.[13]  Those allegations are insufficient.

### A.      There Is No Basis for Personal Jurisdiction over Mr. Sun

Mr. Sun is a foreign citizen residing abroad.  Sun Decl. ¶ 2.  Plaintiffs claim that as a

representative of TRON, Mr. Sun traveled to the United States, attended and spoke at

conferences long after the alleged ICO where he touted TRX, and promoted TRX on social

media.  Compl. ¶¶ 28, 67.  As for contact with the state of New York, plaintiffs' sole allegation

is that, also long after the ICO, Mr. Sun attended one or more conferences there as a

representative of TRON and hosted TRON community events.  *Id.* ¶¶ 28, 70.  Even if true,

"[j]urisdiction over a corporation's board member, officer or employee, in his or her individual

capacity, must be premised on the defendant's own personal contacts with the forum, and not the

acts and/or contacts carried out by the defendant in his or her corporate capacity."  *In re Terrorist*

*Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456, 471 (S.D.N.Y. 2010), *aff'd*, 714 F.3d 109; *see*

*also King Cty. v. IKB Deutsche Industriebank AG*, 769 F. Supp. 2d 309, 320-21 (S.D.N.Y. 2011)

---

[13] Nor could plaintiffs argue for general jurisdiction, given that Mr. Sun is domiciled abroad and
TRON's principal place of business is abroad.  *In re Terrorist Attacks*, 714 F.3d at 674 ("[f]or an
individual, the paradigm forum for the exercise of general jurisdiction is the individual's
domicile") (quoting *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 924 (2011));
*Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016) ("[E]xcept in a truly
'exceptional' case, a corporate defendant may be [subject to general personal jurisdiction] only
where it is incorporated or maintains its principal place of business." (quoting *Daimler AG v.
Bauman*, 571 U.S. 117, 138-39 (2014))).

(contacts of a corporate defendant cannot be imputed to individual defendants based on "the mere fact of their positions").  Mere control person status does not establish minimum contacts or satisfy due process.  *See In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449, 454 (S.D.N.Y. 2005); *see also FDIC v. Milken*, 781 F. Supp. 226, 234 (S.D.N.Y. 1991) ("control person liability under the securities laws is not germane to the issue of personal jurisdiction").

Moreover, courts have held that mere attendance at conferences or networking events are insufficient, at least where, as here, the claims do not specifically arise from the contact.  *Phillips v. Reed Grp., Ltd.*, 955 F. Supp. 2d 201, 232 (S.D.N.Y. 2013) (meeting in New York insufficient) (citing *NCA Holding Corp. v. Ernestus,* 1998 WL 388562, at \*5 (S.D.N.Y. July 13, 1988)); *Capitol Records, LLC v. VideoEgg, Inc.*, 611 F. Supp. 2d 349, 358 (S.D.N.Y. 2009) ("random, fortuitous and attenuated contacts" not enough) (citation omitted).

Nor do plaintiffs allege that their claims against Mr. Sun (or, for that matter, TRON) arise out of, or are sufficiently related to, such limited contacts.  *See Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006) (requiring a "substantial relationship" between the contact and the "cause of action sued upon").  To the contrary, plaintiffs do not even allege any primary liability claims against Mr. Sun (and do not claim to have attended the conferences or had any dealings or contacts with Mr. Sun whatsoever), much less that the basis for their control person claim against him is somehow predicated on anything he did here.  He is a foreign citizen who should not be hauled into a U.S. court merely because he allegedly "controlled" TRON.[14]

---

[14] Plaintiffs' personal jurisdiction allegations also reference N.Y. CPLR § 302(a)(1), but that statute actually underscores the deficiencies here.  Under Section 302(a)(1), a defendant "must have transacted business within the state" and "the claim asserted must arise from that business activity."  *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013).  In other words, the claim has to be tied to some substantial act such that the defendant is deemed to have

**B.**   **Even a "Nationwide Contacts" Analysis Would Not Justify the Exercise of Specific Personal Jurisdiction over Mr. Sun or TRON**

The Second Circuit "has not yet decided" whether in a civil case arising under "a federal statute [that] authorizes nationwide service of process, the relevant contacts for determining personal jurisdiction are contacts with the United States as a whole." *Gucci Am., Inc. v. Li*, 768 F.3d 122, 142 n.21 (2d Cir. 2014).  Even if this Court were to apply a nationwide-contacts analysis, however, plaintiffs have not pleaded (a) sufficient claims-related nationwide contacts to support the exercise of specific jurisdiction, or (b) that the exercise of jurisdiction would be reasonable and otherwise consistent with due process.  *See In re Amaranth Nat. Gas. Commodities Litig.*, 587 F. Supp. 2d 513, 526-27 (S.D.N.Y. 2008) (under federal, Constitutional due process principles, a court must apply a minimum contacts test and a reasonableness inquiry), *aff'd*, 730 F.3d 170 (2d Cir. 2013).

Plaintiffs allege that "Defendants maintained an interactive dynamic website in English, accessible by and targeted to United States users, where it described the TRX token and made whitepapers available."  Compl. ¶ 27.  It is hardly surprising – and hardly relevant – that a sophisticated and multinational company like TRON maintains an English language website.  English is a global language and the language of Singapore, TRON's place of formation.  Singapore Const. § 153A.  It also is conclusory to state that the website targeted U.S. users; without more, this Court has found such allegations insufficient.  *See, e.g.*, *Alibaba Grp. Holding Ltd. v. Alibabacoin Found.*, 2018 WL 2022626, at *4 (S.D.N.Y. Apr. 30, 2018) (rejecting assertion of jurisdiction based on website when plaintiff could not establish any actual commercial effect on the forum from the site); *Royalty Network Inc. v. Dishant.com, LLC*, 638 F.

---

"purposefully avail[ed] itself of the privilege of conducting activities within [New York]." *Ehrenfeld v. Bin Mahfouz,* 9 N.Y.3d 501, 508 (2007).  Plaintiffs have not made the required showing as to Mr. Sun (as discussed above) or TRON (as discussed below).

Supp. 2d 410, 418 (S.D.N.Y. 2009) ("[T]he mere availability of the site to users in [the forum], standing alone, does not [confer jurisdiction]").

Plaintiffs allege that in November 2017, TRON opened an office in San Francisco, California.  Compl. ¶ 27.  This too is insufficient for specific personal jurisdiction.  The Amended Complaint contains no facts tying the August-September 2017 TRX offering to the alleged November 2017 office opening – despite the notable absence of concurrency between the two.  Similarly, plaintiffs contend TRON may prosecute trademarks in the United States.  As with the office allegation, the trademark assertion is unconnected to any of the claims asserted.

Likewise, supposedly commenting on TRX at U.S. blockchain conferences (*id.* ¶¶ 27-28), traveling to the United States in 2017 shortly after the ICO (*id.* ¶ 70), or even tweeting about U.S. users' access to TRX secondary markets (*id.* ¶ 79) does not suffice.  *See Lopez v. Shopify, Inc.*, 2017 WL 2229868, at *20-21 (S.D.N.Y. May 23, 2017) (generalized promotional and advertising activities attenuated from claims not sufficient for specific personal jurisdiction); *Reliance First Capital, LLC v. Mid Am. Mortg., Inc.*, 2019 WL 2504039, at *10 (E.D.N.Y. June 17, 2019) (posts on Twitter, a world-wide medium, not sufficient to create claim-related contacts with the forum).  The social media commentary, in particular, adds little, because of plaintiffs' failure to link it either to the TRX ICO (which the commentary post-dated) or to *plaintiffs'* token purchases.  *See Absolute Activist Master Value Fund, Ltd. v. Ficeto*, 2013 WL 1286170, at *12 (S.D.N.Y. Mar. 28, 2013) (even 3-5 "fundraising trips" to the United States insufficient; alleged injury not "proximately caused by those contacts") (quoting *Chew v. Dietrich*, 143 F.3d 24, 29 (2d Cir. 1998)).

No different is the suggestion that TRON may be subject to specific jurisdiction because it allegedly targeted the United States and its users by entering into listing agreements with

digital token exchanges.  *See* Compl. ¶¶ 136-44.  For example, the very exchange on which plaintiffs claim to have purchased TRX, Binance, is believed to be the world's largest exchange by daily volume, was founded abroad in China or Hong Kong by a Chinese national (just like TRON), is now based in Malta, and offers digital token trading to customers all over the world. Sun Decl. ¶ 6; *see also Anderson et al.*, 20-cv-2803-ALC, Dkt. No. 43 ¶ 24.  Given such exchanges' worldwide and generally non-U.S.-focused scope, pointing to listing agreements with them to suggest TRON's offering targeted U.S. users does little to establish "purposeful availment." *Amaranth*, 587 F. Supp. 2d at 527.

Finally, the exercise of jurisdiction here would not comport with traditional notions of fair play and substantial justice.  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  Plaintiffs chose to buy TRX tokens on a foreign exchange and have had no direct dealings with Mr. Sun or TRON.  Nor do their claims arise out of either's alleged U.S. contacts.  Mr. Sun lives halfway across the world in Hong Kong.  The exercise of personal jurisdiction would not be appropriate here.  *Blockchain Luxembourg S.A. v. Paymium, SAS*, 2019 WL 4199902, at *12-13 (S.D.N.Y. Aug. 7, 2019) (no personal jurisdiction over French CEO where complaint was "devoid of any specific allegations" connecting him to the plaintiffs, forum or alleged injury).

### C.   Alternatively, this Court Should Dismiss on Grounds of *Forum Non Conveniens*

Even if personal jurisdiction did exist, "[t]he doctrine of *forum non conveniens* permits a court to dismiss a claim even if the court is a *permissible* venue with proper jurisdiction over the claim."  *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 73 (2d Cir. 1998); *see Red Rock Holdings, Ltd. v. Union Bank Trust Co., Ltd.*, 1998 WL 474094, at *1 n.1, *5 (S.D.N.Y. Aug. 11, 1998) (dismissing case pursuant to *forum non conveniens* without reaching questions of personal jurisdiction), *aff'd as modified*, 181 F.3d 83 (2d Cir. 1999).  Whether a case should be

dismissed due to *forum non conveniens* involves a three-step inquiry: first, the court "determine[s] the degree of deference owed to plaintiff's choice of forum," *Tagger v. Strauss Grp. Ltd.*, 2018 WL 4356725, at *4 (E.D.N.Y. Sept. 12, 2018) (citing *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 70 (2d Cir. 2003)), *aff'd*, 951 F.3d 124 (2d Cir. 2020), based "on a sliding scale depending on several relevant considerations," *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001).

In *Iragorri*, the Second Circuit faced the same circumstance this Court faces: "a United States resident plaintiff's suit in a U.S. district other than that in which the plaintiff resides." *Iragorri*, 274 F.3d at 71.  Here, plaintiffs—residents of Nevada and Texas—filed suit in the Southern District of New York.  In such circumstances, the Second Circuit instructed that:

> the more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons—such as attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, the habitual generosity of juries in the United States or in the forum district, the plaintiff's popularity or the defendant's unpopularity in the region, or the inconvenience and expense to the defendant resulting from litigation in that forum—the less deference the plaintiff's choice commands and, consequently, the easier it becomes for the defendant to succeed on a *forum non conveniens* motion by showing that convenience would be better served by litigating in another country's courts.

*Id.* at 72.  No plaintiff has any apparent connection to New York.  Compl. ¶¶ 18-20.  Instead, each plaintiff chose to purchase TRX, issued by a Singapore company, utilizing Binance, a foreign exchange based in Malta.  In other words, the heart of the case relates to events that occurred or were executed overseas, thousands of miles from New York, where nothing giving rise to plaintiffs' claims is alleged to have occurred.

Second, the analysis looks to whether an adequate alternate forum exists.  *See Pollux*, 329 F.3d at 70.  "A forum is not inadequate even if the foreign justice system differs from that of the United States."  *PT United*, 138 F.3d at 73.  Rather, courts consider whether: (1) the defendant is

amenable to service of process in the alternate forum; (2) the plaintiff is able to have his claims adjudicated fairly; and (3) the plaintiff can litigate his claims safely and with peace of mind.  *See Base Metal Trading Ltd. v. Russian Aluminum*, 98 F. App'x 47, 49-51 (2d Cir. 2004) (affirming that Russia is an "adequate forum").  Here, there is at least one adequate alternate forum: Singapore, TRON's place of formation and where plaintiffs purport to have served process. Courts in this district have recognized that Singapore is an adequate forum. *See, e.g.*, *Wave Studio, LLC v. Gen. Hotel Mgmt.*, 2017 WL 972117, at *7 (S.D.N.Y. Mar. 10, 2017); *Anwar v. Fairfield Greenwich Ltd.*, 742 F. Supp. 2d 367, 376 (S.D.N.Y. 2010).  In fact, the accompanying Declaration of Suresh Nair, an expert on Singapore law, outlines plaintiffs' path to pursue claims in Singapore (including in a representative capacity under Singapore law), where the courts are well-versed in applying U.S. law as needed, and plaintiffs face no material substantive or procedural barriers to replicating their claims.

Third, courts consider "*Gilbert* factors."  These include private considerations, such as "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; . . . and all other practical problems that make trial of a case easy, expeditious and inexpensive."  *Iragorri*, 274 F.3d at 73-74 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947), *superseded by statute on other grounds*).  These factors further militate toward dismissal.  All relevant witnesses and evidence are located outside New York.  Indeed, all or virtually all TRON or third-party witnesses and evidence are located abroad, in East Asia or elsewhere.  Sun Decl. ¶ 5.  It would create significant hardship for all witnesses and evidence to be transported to New York.  In fact, plaintiffs are not in New York either; and while we acknowledge that a court in Singapore may be less convenient for the named plaintiffs than New York, the issue is not whether Singapore is

a perfect forum; rather, the issue is whether it is a better forum under the circumstances presented here, where plaintiffs voluntarily chose to engage in inherently foreign trading in a Singapore company utilizing a foreign exchange.

Courts also consider "public factors," which include "[a]dministrative difficulties" which arise "when litigation is piled up in congested centers instead of being handled at its origin." *Iragorri*, 274 F.3d at 74 (quoting *Gilbert*, 330 U.S. at 508-09).  This Court's docket is one of the busiest in the country.  Given that the "origin" of this litigation is outside the United States, neither this Court nor a New York jury should be forced to hear this matter.

## <u>CONCLUSION</u>

For the foregoing reasons, this action should be dismissed for failure to state a claim, for lack of personal jurisdiction, or under the doctrine of *forum non conveniens*.

Dated:  December 15, 2020

Respectfully submitted,

FENWICK & WEST LLP

By: */s/ Dean S. Kristy*
    Dean S. Kristy (NY Bar #1945658)
    Casey O'Neill (NY Bar #4715363)
    Michael S. Dicke (Calif. Bar #158187)
    (admitted *pro hac vice*)
    Alison C. Jordan (Calif. Bar #311081)
    (admitted *pro hac vice*)
    555 California Street, 12th Floor
    San Francisco, CA  94104
    Telephone:  415.875.2300
    Facsimile:  415.281.1350
    Email:    dkristy@fenwick.com
    Email:    coneill@fenwick.com
    Email:    mdicke@fenwick.com
    Email:    ajordan@fenwick.com

    *Attorneys for Defendants*
    TRON FOUNDATION and JUSTIN SUN